**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GREGORY BROWN,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:14-0623** |
| | : | |
| **v** | : | **(JUDGE MANNION)** |
| **ELLEN MACE-LIEBSON,** | : | |
| **Defendants** | : | |

## MEMORANDUM

## I.    Background

Plaintiff, Gregory Brown, an inmate currently confined in the Federal Correctional Institution, Talladega, Alabama, filed the above captioned Bivens[1] action pursuant to 28 U.S.C. §1331. (Doc. 1). The matter proceeds via an amended complaint. (Doc. 15). Brown complains of events which occurred at his former place of confinement, the Federal Correctional Institution, Schuylkill (FCI-Schuylkill), Pennsylvania. Id. The named Defendants are FCI-Schuylkill employees Ellen Mace-Liebson, Clinical Director and Cynthia Entzel, Associate Warden. Id. Specifically, Brown contends that while housed at SCI-Schuylkill, Defendants were deliberately indifferent to his serious medical needs. Id. For relief, Plaintiff seeks

---

[1]Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 397 (1971).

compensatory and punitive damages, as well as injunctive relief for "the actions of Defendants Mace-Liebson and Entzel in the delay and/or denial of Brown's medical care has resulted in the unnecessary and wanton infliction of pain and the possibility of a life-long handicap or permanent loss." Id.

By Memorandum and Order dated March 15, 2016, Defendant Entzel was dismissed from the complaint and the action was permitted to proceed with discovery and the filing of dispositive motions. (See Docs. 69, 70).

Presently before the Court is a motion for summary judgment, filed on behalf of the remaining Defendant, Dr. Ellen Mace-Liebson. (Doc. 114). The motion has been fully briefed and is ripe for disposition. For the reasons that follow, Defendant's motion for summary judgment will be granted.

## II.   **Standards of Review**

### A. **Bivens Standard**

Plaintiff's claims are filed pursuant to 28 U.S.C. §1331, in accordance with Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, (1971). Under Bivens, the District Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 to entertain an action brought to redress alleged federal constitutional or statutory violations by a federal actor. Bivens, supra. Pursuant to Bivens, "a citizen suffering a compensable injury

to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978). A Bivens-style civil rights claim is the federal equivalent of an action brought pursuant to 42 U.S.C. §1983 and the same legal principles have been held to apply. See, Paton v. LaPrade, 524 F.2d 862, 871 (3d Cir. 1975); Veteto v. Miller, 829 F.Supp. 1486, 1492 (M.D.Pa. 1992); Young v. Keohane, 809 F.Supp. 1185, 1200 n. 16 (M.D.Pa. 1992). In order to state an actionable Bivens claim, a plaintiff must allege that a person has deprived him of a federal right, and that the person who caused the deprivation acted under color of federal law. See West v. Atkins, 487 U.S. 42, 48 (1988); Young v. Keohane, 809 F.Supp. 1185, 1199 (M.D.Pa. 1992).

### B. **Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed.R.Civ.P. 56(c)(1); see Celotex,

[477 U.S. at 324](requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." [Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)](). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." [Celotex, 477 U.S. at 323](); see [Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992)](). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. [Fed.R.Civ.P. 56(e)]().

### III.  __Statement of Facts__

From the pleadings, depositions, and exhibits submitted therewith, the following facts can be ascertained as undisputed.

On August 1, 2011, Brown was transferred to FCI-Schuylkill, where he remained incarcerated until his transfer on August 25, 2014, to the Federal Correctional Institution, Edgefield, South Carolina. (Doc. [118-1]() at 16).

On June 30, 2013, while lifting weights over 200 lbs., Brown injured his lower back. (Doc. 118-1 at 67-120). Brown did not report to Health Services that he injured his back. Id. Nor did he complain to anyone on this date that he was in pain. Id. Brown believes that he aggravated his injury when he sat on his mattress in his cell that night. Id.

On July 1, 2013, Brown did not go to health services. Id.

On the morning of July 2, 2013, Brown walked with the assistance of a cane to "sick call" at Health Services, with complaints of back pain and numbness in his left shin area. (Doc. 118-1 at 20). Plaintiff's Clinical Encounter reveals that he was treated by Physician's Assistant (PA) Megan Lingenfelter. Id. PA Ligenfelter examined Brown, finding him alert well and oriented; and she prescribed him Ibuprofen, 200 mg tablets, to be purchased from the commissary and advised Brown on the use of a muscle rub, ice and heat applications, to try the over-the counter medication, and to return to Health Services if he did not experience relief. Id.

Brown prepared and submitted a sick-call request on July 8, 2013, in which he complained of "lower left back pain & swelling and numbness in my lower leg shin area[.]" (Doc. 118-1 at 67-120).

On July 9, 2013, Brown reported to sick call complaining of the following:

**Chief Complaint**: Back Pain
**Subjective**:  left lower back pain with radiation into left lower leg. c/o numbness into left leg. points to inner distal thigh towards - medial malleous. doesn't recall injury, except it started with bend under his bunk one week ago.

(Doc. 118-1 at 22). Brown was examined by PA Rush, who noted a possible sprain or strain of the lumbar region, for which he recommended rest, stretching, range of motion exercises, and warm compresses, and allow four to six weeks for healing. Id.

After ten days, on July 19, 2013, Brown states that he "again returned to sick-call indicating that he was '...experiencing lower left back pain and numbness and swelling in [his] left shin area. . .Brown further indicated that . . .On July 9, 2013, PA Rush opined that it was disk related which was affecting my nerves. As such it has been nearly three weeks and these complications and pain ensue. Therefore, I request to be examined by Dr. Mace and to be scheduled to have a MRI to determine the extent of the nerve damage. . .' Moreover, I further indicated, 'in lieu of seeing PA Lingenfelter at sick call, I'm requesting to be placed on the call-out. . ." (Doc. 15 at 3-4).

On July 23, 2013, Brown appeared for a follow-up encounter at Health Services. (Doc. 118-1 at 25). He was examined by PA Rush and reported the

following:

**Chief Complaint**: Back Pain

**Subjective**: Still with left sided low back pain with radiation into left lower leg. some paresthesis (numbness and hypersensitivity to the left anterior lower leg)

Id. After examining Plaintiff, PA Rush again noted a possible sprain or strain of the lumbar region, provided Brown with a prescription for pain medication (Meloxicam), and ordered an x-ray of Brown's lumbar/spine area. Id.

On July 29, 2013, Brown submitted an Inmate Request to Staff, addressed to Assistant Warden Entzel and copying Defendant Mace-Leibson, in which he states the following:

Today I approached you at mainline in hopes that you could intervene by inquiring as to why I have not been scheduled to be evaluated by a physician as per 6031.01, as I have been seen by MLP's on five separate occasions without a defentive (sic) diagnosis as to the numbness and burning sensations I am experiencing in my left shin and lower back problems that I have been experiencing for the last four (4) weeks. For your convenience I have apendixed (sic) three of the five request for sick-call as responded by the MLP's as well as page 18 of 6031.01 1/15/2005 version which is consistent with the 2012 version of Patient Care. Would you please look into this matter.

(Doc. 118-1 at 121).

On July 31, 2013, Defendant Mace-Leibson responded to Plaintiff's Inmate Request to Staff with the following:

> You were triaged on 7/2 and 7/8 and 7/9. You saw MLP for evaluation on 7/23/13. You have not completed work-up or expected course of treatment. A CD referral is not required at this time as only the actual MLP eval on 7/23/13 constitutes appt with your assigned MLP. Triage by alternate does not count in that 3 visits. You must complete the course of evaluation with your assigned provider.

Id.

On August 16, 2013, Brown had another follow up appointment with PA Rush and Brown complained of lower left back pain. (Doc. 118-1 at 28). He also requested an evaluation by Dr. Mace-Leibson and a possible osteopathic manipulative treatment ("OMT"). Id.

Upon examination, PA Rush noted a sprain/strain of the lumbar region and swelling (effusion) of the left knee joint with bruising of the medial meniscus. Id. PA Rush advised Brown to rest, stretch, avoid aggravating activities, ordered an x-ray of his left knee and advised him to use over-the counter medications as needed. Id. PA Rush also discussed treatment options, including Tegretol, Gabapentin, Prednisone and Elavil, which Brown declined until he had an opportunity to be evaluated by Dr. Mace-Leibson. Id. During the exam, Brown told PA Rush that after he read a medical manual that an inmate let him borrow that Brown thought his symptoms were consistent with a herniated disc, and he had static nerve damage. (Doc. 118-1 at 67-120).

On September 17, 2013, Dr. Mace-Leibson evaluated Brown, at which time he complained of the following:

**Chief Complaint**: Back Pain

**Subjective:**    Low back pain and "numbness" in left medial leg. Says sat down in July and felt something in his back and left medial leg started with numbness and slight burning pain. Still is lifting weights and doing activities. Has been lifting up to 500 lbs at a time. Says that he has been doing so since incarcerated 19 yrs ago. Is requesting MRI "to find out what's in there".

(Doc. 118-1 at 31). Dr. Mace-Leibson noted that Brown weighed 294 lbs. and the x-ray of his lumbar spine, performed on August 6, 2013, was negative. Id. She performed an OMT and assessed Brown as having a sprain and strain of the lumbar region and explained to Brown that an MRI was not clinically indicated because nothing indicated a surgical procedure was warranted. Id. She provided Brown back care information on stretching and educated him that he should not be lifting significantly heavy weights, recommending non-impact aerobic activity and

light weights instead. Id. Plaintiff responded that "in my mind I"m still 20 years old". Id.

On November 21, 2013, PA Rush again examined Brown for his complaints of back pain. (Doc. 118-1 at 67-120).

On January 14, 2014, Dr. Mace-Leibson next saw Brown, when he reported to Health Services for a chronic care visit concerning respiratory and hypertension issues. (Doc. 118-1 at 34). At this time, Brown complained of the following:

**Chief Complaint**: Respiratory

**Subjective**:          Reports compliance with medications. Denies CP, etc. Exercise = not since July 2013 – injured self "my leg messed up". C/o left knee discomfort and "fells like it will give out on me sometimes". Denies doing any knee exercises, nonimpact exercise, etc. Says that OMT was only helpful for the numbness in the leg and the low back pain but still has issues with the knee feeling like it is weak or going to give out. Is demanding to have an MRI done on the knee "to see what's in there". Not happy with x-ray dx b/c "that don't look at the muscles and tendons".

Id. After examining Plaintiff, Defendant Mace-Liebson noted the following:

**Musculoskeletal**
    **Gait**
        Yes:  Normal Gait
Mr. Rush and I were both present for the entire visit. His knee exam was completely normal in terms of range of motion and ligament testing. He has no atrophy of muscles, no weakness and no other findings that would indicate an MRI is necessary. He has normal reflexes and movement. He was able to hop on and off the exam table and walk quickly down the hallway as he was shouting that he was "going to take this all the way" when he was not able to get what he wanted. There is no loss of reflexes or change in ADLs that indicate an MRI of the back is

**Other**:

> Pt was completely unwilling to discuss exercise/rehab program, weight loss (his current weight is 291 lbs – target recommended weight for his height is ~175 lbs) or appropriate other measures. He has in his mind what he wants and will not listen to why MRI is not medically indicated or what he should be doing instead. Mr. Rush and I both tried to explain it to him but he kept interrupting, became verbally aggressive, derogatory and unpleasant. When we continued to try to explain why we were not ordering an MRI, he hopped off the table and walked out. Pt's BP measurement was unreliable today due to pt gesturing and getting angry about his knee issue from start of appt.

Id. Plaintiff's x-ray results noted "mild OA (osteoarthritis) on knee, LS x-ray negative". Id.

On February 6, 2014, Brown had a follow up appointment with PA Rush when he complained of "numbness tingling of his left leg, states medial aspect of ankle numb, feels like spasms in quads all the time, states left quad is smaller, still with lower back, on left side, sharp pain, left knee still feels funny." (Doc. 118-1 at 41). Upon examination, PA Rush found that Brown had slight atrophy, as the right quad measured 63 cm and the left at 61.5. Id. PA Rush observed no loss of strength or weakness, noting Brown was able to move fast and jump up/down off of a table. Id. Plaintiff stated he could not ride

warranted either.

**Other**:

> Pt was completely unwilling to discuss exercise/rehab program, weight loss (his current weight is 291 lbs – target recommended weight for his height is ~175 lbs) or appropriate other measures. He has in his mind what he wants and will not listen to why MRI is not medically indicated or what he should be doing instead. Mr. Rush and I both tried to explain it to him but he kept interrupting, became verbally aggressive, derogatory and unpleasant. When we continued to try to explain why we were not ordering an MRI, he hopped off the table and walked out. Pt's BP measurement was unreliable today due to pt gesturing and getting angry about his knee issue from start of appt.

Id. Plaintiff's x-ray results noted "mild OA (osteoarthritis) on knee, LS x-ray negative". Id.

On February 6, 2014, Brown had a follow up appointment with PA Rush when he complained of "numbness tingling of his left leg, states medial aspect of ankle numb, feels like spasms in quads all the time, states left quad is smaller, still with lower back, on left side, sharp pain, left knee still feels funny." (Doc. 118-1 at 41). Upon examination, PA Rush found that Brown had slight atrophy, as the right quad measured 63 cm and the left at 61.5. Id. PA Rush observed no loss of strength or weakness, noting Brown was able to move fast and jump up/down off of a table. Id. Plaintiff stated he could not ride

bike as instructed. Id. PA Rush PA Rush recommended weight loss, educated Brown on lower back pain with sciatica and recommended follow-up with either Sick Call or Chronic Care Clinic, as needed. Id.

On July 15, 2014, Brown was seen by PA Rush for a Chronic Care encounter at Health Services. (Doc. 118-1 at 45). He complained that he was "still having symptoms in left leg". Id.

PA Rush recommended that Brown ride a stationary bike and continue range of motion and stretching exercises for his back. Id.

On August 25, 2014, the Bureau of Prisons transferred Brown from FCI-Schuylkill to FCI-Edgefield. (Doc. 118-1 at 16).

On September 17, 2014, Brown was scheduled for a Chronic Care encounter at Health Services but was a "no show". (Doc. 118-1 at 50).

On October 6, 2014, Brown is seen at a Chronic Care encounter performed at SCI-Edgefield Health Services, where the following is recorded:

**Chief Complaint**: Hypertension

**Subjective**:    Pt is a 42 yo AAM in concerning his HTN, Asthma and chronic Hep C. He did not show for his 0900hr appointment and had to be called out to the medical clinic. He is irritable and immediately confrontational. While taking his vital signs, starting with his weight, he is informed that his BMI is 41, placing him in the "Extremely Obese" range. He becomes agitated and angry stating that he has been called "extremely fat".

> He is corrected and informed that "Fat" would mean
> that his BMI would be 30 and his wt would be 215
> according to the BMI chart. He then states that he is
> unwilling to undergo any further examination or
> evaluation and refuses to sign a Medical Treatment
> refusal form. He becomes verbally threatening
> indicating that "I can't speak very well but I can write".
> He states that he has been treated in a
> condescending manner that it totally unprofessional.
> He is unwilling to reconsider his visit. He is assured
> that is not the case and that he is being treated as
> every other patient. He further indicates that he has
> been seen by CD last week. Chart will be reviewed by
> CD.

(Doc. 118-1 at 51).

On January 11, 2016, Brown received a Lumbar Epidural Steroid Injection as well as a Nerve Root Block, and was scheduled for a referral to Edgefield Hospital for an MRI. (Doc. 132-2 at 3). On February 9, 2016, Brown was transported to Edgefield Hospital for an MRI. (Doc. 132-2 at 4). The report revealed that the "overall appearance of the lumbar spine is stable with left L4-5 protrusion and right L5-S1 protrusion" and "no new protrusion or extrusion identified" as well as "no endplate inflammatory changes nor facet joint inflammatory changes identified". Id.

On May 10, 2016, the SCI-Edgefield Clinical Director entered the following Administrative Note into Plaintiff's medical records:

Spoke via telephone with MD at Pain Management Center. He

has reviewed the pt's previous and most recent MRIs. He reports the findings appear to be stable with some improvement in L5-S1 area. Pt's muscle atrophy appeared to have stabilized at the most recent visit to his office. Recommendations: Pt has had serial epidural injections. If pt's symptoms are unchanged then another injection would not be expected to bring further improvement. Next course of action would be to refer back to Surgeon to determine if surgery would be an option although his opinion, as the pt's condition appears stable then he would not recommend a rush to surgery at this point. Recovery from atrophy is considered strongly possible. Medical hold will be removed.

(Doc. 132-2 at 7).

The Bureau of Prisons transferred Brown to FCI-Hazelton on June 6, 2016, (Doc. 118-1 at 14) where he continued to receive conservative treatment. Specifically, on June 8, 2016, a Chronic Care Encounter was performed at FCI-Hazelton Health Services, with the following findings:

Patient here for chronic care clinic history is significant for lumbar bulging dis on MRI, lower back pain with radicular pain in his RLE, HTN and HCV infection. Currently has no acute complaints but is requesting to see an orthopedic surgeon secondary to his back. It was explained to him that the latest MRI showed stable finding and most likely the treatment will be conservative as surgery might do more harm than good. Patient continued to insist on seeing a surgeon.

Such conservative treatment has continued. Plaintiff's most recent medical record of file, a January 4, 2017 consult with West Virginia University Department of Neurosurgery, recommended "continue medical management" with a referral to "Pain clinic for Facet rhizotomy L5-S1", a prescription for

Naproxen and a follow up on six months. (Doc. 132-2 at 14).

## IV.   **Discussion**

In order to establish an Eighth Amendment medical claim, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003). See also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." Id.

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference." [Farmer v. Brennan, 511 U.S. 825, 837 (1994)](). Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment..." [Estelle v. Gamble, 429 U.S. 97, 106 (1976)](). For instance, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." Id., [429 U.S. at 107](). "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." [Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990)](). Further, a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment. See [White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990)](). In sum, negligence, unsuccessful medical treatment, or medical malpractice does not give rise to a [§1983]() cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. See [Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993)]().

Further, a prison administrator cannot be found deliberately indifferent under the Eighth Amendment because he or she fails to respond to the medical complaints of an inmate being treated by a prison physician, or

because, as non-physicians, they defer to the medical judgment of the inmate's treating physicians. Id., 991 F.2d at 69. If, however, non-medical prison personnel had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," liability may be imposed. Spruill, 372 F.3d 236.

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988). See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976).

Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996). The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer v. Carlson, 685 F. Supp. at 1339.

The record before this Court demonstrates that Plaintiff received substantial medical attention, and that the attention Plaintiff received lacks the

requisite deliberate indifference to support a [Section 1983](#) claim. Specifically, between July 2, 2013 and August 25, 2014, the date on which the Bureau of Prisons transferred Brown to FCI-Edgefield, Plaintiff had been seen, or his medical concerns were addressed, on at least a dozen different occasions. Defendant, Dr. Mace-Liebson personally examined Plaintiff on two of these occasions, September 17, 2013 and January 14, 2014. There is no indication that at either visit, medical treatment was denied or intentionally withheld. At both visits, Plaintiff was thoroughly examined, offered the results of his x-ray, which revealed mild osteoarthritis in the left knee, and was counseled as to the objective findings indicating that an MRI was not necessary.

At best, the record demonstrates Plaintiff's disagreement with the type of treatment rendered. However, his mere disagreement with the course of action that the medical department took based on the symptoms he presented, is not enough to state a [§1983](#) claim. [Sample v. Diecks, 885 F.2d 1099, 1109 (3d Cir. 1989)](#) (citing [Estelle, 429 U.S. at 105–06](#) (in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind)). This is particularly so in light of the fact that there are no facts of record that demonstrate that Defendant, Dr.

Mace-Liebson intentionally withheld medical treatment from Plaintiff in order to inflict pain or harm upon Plaintiff. Farmer; Rouse.

Even holding Plaintiff's complaint to the less stringent pleading standards of *pro se* plaintiffs, the allegations do not sufficiently allege deliberate indifference. Brown does not suggest, nor does the record support, that Defendant, Dr. Mace-Liebson was aware that there was an excessive risk to his health or safety but wantonly refused to provide him medical care. Spruill v. Gillis, 372 F.3d 218, 236 n. 12 (3d Cir. 2004) (stating that while a *pro se* complaint should be read liberally, an inmate plaintiff must still allege that defendant was aware of the risk and intentionally disregarded it). Thus, Plaintiff's complaint amounts to nothing more than Plaintiff's subjective disagreement with Defendant, Dr. Mace-Liebson's treatment decisions, in particular, not to order an MRI. However, there is no indication in the record that an MRI in this case would have lessened Brown's back pain, or would have supported a surgery. In fact, the record demonstrates that in the three years since leaving FCI-Schuylkill, Plaintiff has received an MRI, and is still being treated conservatively for his back problems. Once again, "mere disagreements over medical judgment" do not rise to the level of an Eighth Amendment violation. White, 897 F.2d at 110.

Thus, the Plaintiff has failed to present evidence from which a reasonable jury could conclude that the Defendant, Dr. Mace-Liebson possessed the culpable mental state necessary for Eighth Amendment liability to attach. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d at 346; West v. Keve, 571 F.2d at 161. Indeed, the extent and quality of medical attention that was provided to Plaintiff precludes a finding of deliberate indifference.

## V.      Conclusion

Based upon the record before this Court, Defendant, Dr. Mace-Liebson is entitled to summary judgment with respect to Plaintiff's Eighth Amendment medical claim. An appropriate order shall issue.


*S/Malachy E. Mannion*
**MALACHY E.  MANNION**
**United States District Judge**

**Dated: September 29, 2017**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-0623-01.wpd